[No. 6990.    Decided May 26, 1908.]

Foss Investment Company, *Plaintiff and Appellant,* v.
Emma J. Ater, *Respondent,* O. E. Darling,
*Intervener and Appellant.*[1]

Brokers—Authority—Agent for Owner—Acting in Own Interest—Vendor and Purchaser—Contract. A real estate broker acting pursuant to authority initiated by his letter to the owner stating "I can sell your lot," and asking the best price, is a selling agent only, without authority to make a binding contract of sale, upon receipt of a letter from the owner stating that she will take a certain sum net, where the owner had no notice that the broker was attempting to purchase in his own interest.

Same. A sale of real estate is voidable at the option of the owner, where the broker was acting as selling agent . for a nonresident owner, and knew that the property was rapidly increasing in value, but failed to communicate that fact to the owner, and made a sale for his own practical benefit to a corporation controlled and owned by him, without the knowledge of the owner that the agent was interested in the sale.

Vendor and Purchaser—Contract—Specific Performance. No binding contract of sale that can be specifically enforced against the owner is shown by a nonresident owner's letter offering to take $800 net, and a telegram from the agent "offer accepted" without tender of the money, especially where the owner replied by wire that she was awaiting guarantee of the cash; and deposit of the cash in a bank with request for telegraphic acceptance of such deposit, is not sufficient to bind the sale where the owner never accepted such deposit, but, upon hearing thereof, answered that the lot was sold.

Same—Brokers—Authority to Sell. A nonresident owner of real estate, who had listed her property for sale with a Philadelphia broker, is not bound by a contract of sale entered into by a local broker at Tacoma, Washington, for the price of $800, subject to the owner's approval, where the local broker undertook to obtain the owner's consent to the sale by negotiations through the Philadelphia broker, who represented the deal as an offer of $700 net to the owner, which she accepted, the real contract never having been submitted to her, and the agents never having been given any authority to make a binding contract of sale.

[1]Reported in 95 Pac. 1017.

SAME—RATIFICATION. In such a case, the execution of a blank deed to close the deal would not amount to a ratification by the owner of the sale by the local brokers, where the deed was not sent to the local broker, and the owner never knew of his offer of $800 for which the deed was secured.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered August 1, 1907, upon findings in favor of the defendant, after a trial on the merits before the court without a jury, in an action to enforce the specific performance of a contract to sell real estate. Affirmed.

*Boyle, Warburton, Quick & Brockway,* for plaintiff.
*Fogg & Fogg,* for defendant.
*H. G. & Dix H. Rowland,* for intervener.

CROW, J.—Action by the Foss Investment Company, a corporation, against Emma J. Ater, to enforce specific performance of a contract by which, it is alleged, the defendant agreed to sell certain real estate to the plaintiff. O. E. Darling, by complaint in intervention, also sought to enforce the specific performance of a separate and distinct contract by which, he alleged, the defendant covenanted to sell the same real estate to him. The defendant denied the making of either contract. Pending the action, the real estate was by agreement sold, all the parties stipulating that its proceeds should be awarded to the one succeeding in this litigation. From a judgment in favor of the defendant, the plaintiff and intervener have appealed.

There being two appellants, we will in this opinion allude to the respective parties as plaintiff, defendant, and intervener. The alleged contracts severally pleaded by the plaintiff and intervener being distinct and separate, the trial judge heard and determined the issues as to each of them separately, and we will consider the appeals in the same manner. On the issues arising between the plaintiff, Foss In-

vestment Company, and the defendant, Emma J. Ater, findings were made and entered from which it appears, that the plaintiff, Foss Investment Company, was and is a corporation; that Louis Foss & Co. was and is a copartnership firm consisting of Louis Foss and W. D. E. Anderson, each with a one-half interest, engaged in the real estate business in the city of Tacoma; that in October and November, 1905, the defendant, Emma J. Ater, then residing in New York City, was the owner of lot 5, in block 7522, Tacoma Land Company's Addition to Tacoma, Washington; that in October, 1905, Louis Foss wrote Emma J. Ater, on a letter-head of Louis Foss & Co., as follows:

"Emma J. Ater:
"Dear Madam—I can sell your lot on No. 5, block 7522. Please give me your best price and I can dispose of it if the price is reasonable.          Yours truly,      Louis Foss;"

that the defendant answered as follows:

"Louis Foss & Co., Tacoma, Wash.
"Gentlemen—Your favor referring to sale of lot 5, block 7522 is just received. I will take $800.00 net for the lot. I shall be glad to hear from you as soon as possible, as there are now prospective buyers.          Very truly,
"Nov. 3rd, 1905.                    Emma J. Ater;"

that on November 10, 1905, the defendant received at her residence in New York City the following telegram:

"Emma J. Ater, No. 32 West 38th St., New York City.
"Offer accepted. Lot sold. Send abstract. Will forward deed for your signature. Answer. Louis Foss & Co;"

that in response thereto she sent, on or about Nov. 10, 1905, the following telegram:

"Louis Foss & Co., 320 Washington Bldg., Tacoma, Wn.
"Awaiting guarantee eight hundred cash net. I will send abstract.                    Emma J. Ater;"

that afterwards, on the evening of November 11, 1905, the defendant, Emma J. Ater, received at her residence in New

York City a telegram from the Pacific National Bank of Tacoma, reading as follows:

"John has deposited $800, eight hundred dollars to be paid you on examination of title. Send abstract to us. Wire acceptance;"

that at the time the telegram was sent it read "Foss" instead of "John;" that the words "Wire acceptance" were added to the telegram by the bank at the direction of Louis Foss, for the purpose of ascertaining whether the deposit in the Pacific National Bank of Tacoma was acceptable to the defendant Ater; that the defendant Emma J. Ater immediately answered the last telegram as follows: "The lot is sold;" that at the time the bank sent its telegram to Emma J. Ater, it also wrote her as follows:

"Emma J. Ater,
    "32 West 38th Street, New York City.
    "Dear Madam—We enclose herewith confirmation of telegram sent you today, and beg to advise you, we are holding $800 to be paid over to you on the examination and satisfactory title to the property referred to in your telegram to Mr. Foss. Upon examination of this title, and if found clear, we will forward deed for you to sign, in care of the Chase National Bank of New York City, who will notify you to call and sign the deed, and they will pay you the money. Kindly forward abstract at your earliest convenience;"

that thereupon Louis Foss sent to Emma J. Ater a deed to be executed by her, and so notified the bank; whereupon the cashier of the bank wrote her as follows:

"Emma G. Ater,
    "32 West 38th Street, New York City.
    "Dear Madam—Mr. Foss was in this morning and informed me he had sent you a blank warranty deed. This is not in accordance with the arrangement made by the bank, and when we have the abstract examined and find that the property is clear and you can give a good deed, we will forward deed, as per our letter of yesterday, to the Chase National Bank of New York City, where the money will be

paid to you upon your signing and acknowledging a satis-
factory deed;"

that both of the above letters were received by the defendant
in due course of mail about five days after their date; that on
November 12, 1905, the defendant received from Louis Foss
& Co. a telegram as follows:

"Property sold to Foss Investment Co. Suit will be com-
menced unless you execute deed. Answer;"

which she immediately answered by telegram as follows:
"Deed executed before guaranty received;" that the defend-
ant Emma J. Ater never had any oral communication with
Louis Foss, or Louis Foss & Co., or the Foss Investment Com-
pany, relative to the lot, nor did she communicate with them
in any manner, except by letter or telegram; that she had no
knowledge, notice, or information that Louis Foss or Louis
Foss & Co. had attempted or pretended to sell, or enter into
any contract of sale for, the lot, except as shown by the above
letters and telegrams; that she never heard of the Foss In-
vestment Company until she received the telegram of Novem-
ber 12, 1905, threatening suit, above set forth; that she had
no notice, knowledge, or information as to who were the
stockholders in the Foss Investment Company, or as to the
relations existing between the company and Louis Foss and
Louis Foss & Co.; that she never authorized Louis Foss nor
said Louis Foss & Co. to make any contract of sale; that she
did not intend or contemplate that they or either of them
would attempt to make a contract of sale, but that they would
at most find a purchaser ready, able, and willing to take the
lot at the price of $800 cash net to her; that she did not give
Louis Foss or Louis Foss & Co. any exclusive agency to sell;
that at all times during the communications between Louis
Foss and Louis Foss & Co. and the defendant above named,
Louis Foss was a member of the firm of Louis Foss & Co.;
was president and manager of the plaintiff corporation Foss
Investment Company; that he held nine hundred and ninety-

eight of the one thousand shares of the capital stock of the Foss Investment Company; that his wife and daughter each held one of the two remaining shares; that Louis Foss, Louis Foss & Co., and Foss Investment Company, at all times during the months of October and November, 1905, had their place of business in the same office; that they were all managed by Louis Foss; that the deposit of $800 with the Pacific National Bank of Tacoma consisted of two personal checks made by Louis Foss; that any profit which might have resulted from the purchase of.the lot by the plaintiff would have inured to the benefit of Louis Foss, his wife and daughter; that all arrangements and negotiations between Louis Foss, Louis Foss & Co., and the Foss Investment Company, relative to the transaction, were carried on by Louis Foss personally, acting in his several capacities as Louis Foss, as a member of the firm of Louis Foss & Co., and as president and manager of the Foss Investment Company; that on or about June 11, 1906, all the parties to this action made and entered into a stipulation for the sale of the lot for the sum of $5,000, the proceeds to be deposited in court to abide the result of this action, and to be paid to the successful party, and that the lot was then sold for that price.

The first question with which we are met is whether these findings are sustained by the evidence. As to the sending and receipt of the telegrams and letters above mentioned there is no dispute. Although much conflict arose upon other questions of fact, we have concluded, after a careful examination of all the evidence, that the findings made by the trial judge are supported by its clear preponderance. One of the controlling issues between the plaintiff and defendant is whether Louis Foss, in initiating and conducting the foregoing correspondence with Mrs. Ater, was acting as her selling agent or as purchasing agent for the plaintiff corporation, Foss Investment Company. The trial court, in its conclusions of law, held that he was selling agent for the defendant; that, while he was acting as her agent, he was, without her knowl-

edge or consent, also acting for himself personally, for the
partnership firm of Louis Foss & Co., of which he was a mem-
ber, and for the plaintiff Foss Investment Company, and that
the defendant Emma J. Ater was not bound by his acts in
making the attempted sale. Upon the entire record we feel
compelled to sustain this holding. Our view is that the first
letter written to the defendant by Louis Foss on October 26,
1905, in which he said, "I can sell your lot," was well calcu-
lated to convey to her mind the idea that he only intended to
act as her selling agent in finding a purchaser, provided she
quoted a reasonable price. He did not advise her that he
himself was an intended buyer, nor did he intimate to her that
he was acting for himself or any other person in purchasing
the lot. The correspondence must have indicated to the de-
fendant that he was acting as her selling agent only, and we
hold that as to her he was such agent. This being the fact,
he had authority to find a purchaser ready, willing, and able
to buy at the defendant's price and upon her terms for cash,
but did not have authority to execute to such proposed pur-
chaser a contract of sale that would be binding upon her.
*Carstens v. McReavy*, 1 Wash. 359, 25 Pac. 471.

Louis Foss was selling agent for the defendant, who as his
principal was entitled to the full benefit of his knowledge,
services, and ability. He knew the property was rapidly ad-
vancing in market value, but failed to communicate such
fact to Mrs. Ater, she being a nonresident and in ignorance
of the true situation. About seven months later the lot sold
for $5,000, an advance of five hundred and twenty-five per
cent. The plaintiff is now endeavoring to obtain this advance
which would inure to the practical benefit of Louis Foss, the
agent. He, being the selling agent for Mrs. Ater, and at the
same time agent for the alleged purchaser, as president and
manager of the plaintiff corporation which he substantially
owned and controlled, and having failed to disclose such re-
lations to Mrs. Ater, the alleged contract was at her option
voidable. An agent to sell cannot himself become the pur-

chaser directly or indirectly, without the knowledge and consent of his principal. Louis Foss, defendant's agent, was so closely identified with, and in such complete control of the plaintiff corporation, that practically he would have become the sole beneficiary of all profits and benefits that might accrue to the plaintiff as purchaser.

It is not contended, nor is it shown, that Mrs. Ater ever authorized Louis Foss to execute any contract of sale, and we fail to see how it can be successfully contended that any contract was entered into between the plaintiff and defendant which can be specifically enforced in this action. The negotiations, which were made exclusively through the medium of letters and telegrams, fall short of a completed, enforcible contract. In response to the first letter written by Mr. Foss, the defendant advised him that her selling price would be $800 net, and thereupon he wired her: "Offer accepted. Lot sold. Send abstract. Will forward deed for your signature." This answering wire did not advise the defendant who it was that had accepted her offer. She knew nothing of the personality or financial responsibility of the proposed purchaser. Even though her letter of November 3 be construed as an offer to take $800 net for the lot, such offer could only be accepted by tendering the money. No such tender was made. Mr. Foss' telegram, saying, "Offer accepted," was not, without any tender, such an acceptance as would convert her offer into a binding contract of sale. *Sawyer v. Brossart*, 67 Iowa 678, 25 N. W. 876, 56 Am. Rep. 371; *Sands & Maxwell Lumber Co. v. Crosby*, 74 Mich. 313, 41 N. W. 899; *De Jonge v. Hunt*, 103 Mich. 94, 61 N. W. 341. Not having received the cash or any tender thereof, Mrs. Ater, who knew of other intending purchasers, wired Louis Foss & Co.: "Awaiting guarantee eight hundred cash net. I will send abstract." This wire shows that she was adhering to her original proposition, the substance of which was to sell for cash only, and that cash was necessary to complete the purchase and bind any bargain. Foss did not then remit the cash to her, but took it upon him-

self to deposit it with the Pacific National Bank in Tacoma. At his request the bank then wired the defendant for her acceptance of such guaranty. She never made or indicated any acceptance of the same. On the contrary she by wire immediately advised Mr. Foss that the lot was sold, thus terminating the negotiations. The correspondence between the parties, conducted in contemplation of a proposed sale by Mrs. Ater, never culminated in an enforcible contract upon her part. Her original offer must be construed as one to sell for $800 cash net to her in New York. The only attempted acceptance of such offer was communicated by a wire reading, "Offer accepted," which was transmitted to New York without any tender of cash to complete the acceptance or bind the proposed bargain. No contract was thereafter completed by the subsequent letters and telegrams. Mrs. Ater immediately demanded a guaranty for the $800, but Mr. Foss, without authority from her, deposited his checks in the Pacific National Bank of Tacoma. At his request the bank cashier added to the telegram advising Mrs. Ater of the deposit, the words: "Wire acceptance." These words amounted to a recognition by Foss and the cashier of the fact that Mrs. Ater had the right to, and might, accept or reject such proposed guaranty. She was entitled to, and could have demanded, a tender, deposit, or payment of the money or guaranty in New York City. It may have been, and probably was, the intention of Foss to comply with such demand. The negotiations, however, were still pending, and the evidence is that, before any agreement as to the details of payment, tender, or guaranty was made, the negotiations ceased, and Mrs. Ater advised Foss that the lot had been sold. These facts, which are without substantial dispute, dispose of the plaintiff's contention for the existence of a valid contract of sale. The negotiations were never completed. The minds of the parties did not finally meet on the necessary terms and conditions of the proposed sale.

On the issues between defendant, Mrs. Ater, and the intervener, O. E. Darling, the trial judge made findings of fact from which it appears that, about October 24, 1902, the defendant, Mrs. Ater, in writing, listed the lot here involved and other property with one W. M. Ostrander, a real estate broker in Philadelphia, Pennsylvania, as follows:

"I have this 24th day of October, 1902, placed in the hands of W. M. Ostrander, of Philadelphia, Pennsylvania, for sale of my property located in Tacoma, Washington, consisting of twenty acre building site, ten acre farming land and one building lot, said property to be sold for the sum of twelve thousand dollars ($12,000).

"I agree to pay unto the said W. M. Ostrander a commission of two per cent (2 per cent) of selling price when sale and settlement are made, less the sum of twenty dollars ($20), which I have already paid him as a retaining fee. I reserve the right to withdraw the property from the said W. M. Ostrander's hands at any time.

"I further agree that if the sale of this property be effected by myself or by any person other than the said W. M. Ostrander, I will immediately notify the said W. M. Ostrander of the fact, and will give him the name of the purchaser or purchasers of this property.

"In witness whereof I have hereunto set my hand and seal the day and year above written.

"(Signed) Emma J. Ater;"

that on October 25, 1905, W. G. Peters & Co., real estate brokers in Tacoma, Washington, executed and delivered to the intervener, O. E. Darling, a purported written contract wherein they, as agents, agreed to sell lot 5 in block 7522 to O. E. Darling for the sum of $725, which was increased by a modification of the writing to $800; that the contract so executed is the contract of sale sought to be enforced by the intervener in this action; that the defendant never had any communication with W. G. Peters & Co. or O. E. Darling; that on November 6, 1905, W. G. Peters & Co. sent the following telegram to W. M. Ostrander:

"Offer Ater seven hundred fifty; obtain her contract; wire confirmation."

to which Ostrander replied as follows; the reply being received by Peters & Co. about November 12, 1905:

"In reply to your telegram, I am sending New York representative in today to interview the owner of the lot, and hope to have a telegram in your hands confirming a sale at $750;"

that on November 9, Ostrander sent the following telegram to W. G. Peters & Co.: "Close deal for Ater lot at seven fifty net;" that on the same day he also wrote W. G. Peters & Co. as follows:

'        "Nov. 9th, 1905.
"Messrs. W. G. Peters & Co., 402 Chamber of Commerce,
        "Tacoma, Washington,

"Dear Sir:—Confirming my telegram of even date will say that Mrs. Ater today accepts an offer that will enable me to deliver the property to you at $750 net. If you will send me the name of the bank to which the deed can be forwarded for settlement, I will have the proper instrument executed and send it to you at once. I trust this matter can be closed promptly, now that I have Mrs. Ater in shape to do business. I remain,

        "Very truly yours,        W. M. Ostrander, President;"

that W. G. Peters & Co. replied as follows:

        "Nov. 11th, 1905.
"W. M. Ostrander, Philadelphia, Pa.:

"Dear Sir:—In accordance with your telegram of the 9th inst., would say that we have closed the sale of the Ater lot 5, block 7522, and presume, of course, that they have an abstract of title, and therefore kindly request them to send same to you, which please forward to me. As soon as the title has been examined, or perhaps before, we will send you the deed for execution, with instructions as to drawing on us, with deed attached. We trust you have a contract with her which is binding, so that we will have no delay in closing the sale. Yours very truly, W. G. Peters & Co.;"

that on November 13, 1905, Ostrander wrote W. G. Peters & Co. as follows:

"Nov. 13th, 1905.
"W. G. Peters & Co., Tacoma, Washington:

"Gentlemen:—We have received from Mrs. Ater today her abstract of title covering lot 5, block 7522, and notice that the deed is executed in your favor, and is held by our New York office ready for a settlement, which we can make on a basis of $750 net to us. If you will advise us the name of the bank through which you want the settlement made, I will forward at once the deed and abstract, with proper instructions. We secured these papers at the cost of a good bit of effort, there being another agent in the field who offered her $800 for the same property, and under the circumstances it would be a very great favor if you would so arrange matters that a settlement could be made within thirty days' time. I am, with regards,

"Yours very truly,      W. M. Ostrander, President;"

to which W. G. Peters & Co. replied as follows:

"Nov. 18th, 1905.
"W. M. Ostrander, Philadelphia, Pa.:

"Dear Sir:—Yours of the 13th inst. received and contents noted. We enclose a deed for the signature of Mrs. Ater, which kindly have executed, as we do not desire the title to pass to us, but to the purchaser of the property, who is named as grantee in the deed enclosed. The deal will be promptly closed as soon as the title has been examined, which will only take a few days, after the receipt of the paper. Kindly draw on us for $750 through the Pacific National Bank, of Tacoma. Trusting you will promptly attend to this, we remain, yours truly,      W. G. Peters & Co.;"

that on November 21, 1905, Ostrander also sent the following letter to W. G. Peters & Co.:

"Nov. 21st, 1905.
"W. G. Peters & Co., 402 Chamber of Commerce,
      "Tacoma, Washington:

"Gentlemen:—I am sending forward today to the National Bank of Commerce, Tacoma, the deed and abstract for the Emma J. Ater lot, this being No. 5, block 7522, Tacoma Land Company's First Addition. The bank will have instructions to deliver the same to you upon the payment of $750 net, and will allow sufficient time for examining and continuing the abstract to determine title. You will find

upon examination of the deed that this has been executed in blank; that is, the grantee's name is omitted. The deed was prepared in this way so that you could make an early settlement and fill in the name of the purchaser when you are ready to complete the deal. We are sending the papers forward in order that as early a settlement as possible can be effected, and would advise you to make every effort to have the purchaser take up the matter at once. We have experienced considerable difficulty in getting this deed from the former owner; and since we have had it she claims that she had had several offers, one of them for $1,000, and that her agent in Tacoma is threatening service and attachments which may tie up the deal unless your purchaser can act promptly. Hoping that you will make every effort to secure action before any difficulty arises, I remain,

"Yours very truly,     W. M. Ostrander, President."

That on November 10, 1905, one Wm. C. Moore, the New York representative of Ostrander, pursuant to his instructions, went to defendant at her residence in New York City, and offered her $700 for the lot, stating that sum to be the best price obtainable; that the defendant was never informed by Peters & Co., or by Ostrander, or by his New York representative, that a contract of sale had been entered into with O. E. Darling for $800; that she never authorized or approved any such sale; that she did not know until after the commencement of this action that the alleged written contract of sale had been entered into; that on or about November 10, 1905, the defendant, at the request of Mr. Moore, signed a deed for the lot, without the name of any grantee written therein; that the deed was signed by her on the statement of Moore that it was necessary to enable them to make proper search of the title; that she at the time received from Moore a written certificate to the effect that she would be paid the purchase price on approval of the title; that afterwards the defendant, without any notice or knowledge that Ostrander or any one else had pretended to make or enter into a contract of sale with the intervener Darling, paid to Mr. Moore, as representative of Ostrander, $100 for

the return of the blank deed, which she had theretofore signed, and in which no grantee's name had yet been inserted, and surrendered the certificate which had been given her when the deed was signed; that she never authorized Peters & Co. or W. M. Ostrander to enter into any contract of sale with the intervener or with any one else, and that the agreement with Darling was never submitted to her; that her approval thereof was never asked or obtained.

These findings, which are clearly sustained by the evidence, support the final judgment entered against the intervener. It nowhere appears that Peters & Co. had any authority to enter or execute any written contract of sale on behalf of the defendant with the intervener Darling; nor that the agent Ostrander had authority to enter into any such contract or to authorize Peters & Co. to do so. The evidence shows that Ostrander never claimed any such authority. All that he did when he received an offer for the lot was to open negotiations with the defendant, by submitting other offers to her for acceptance or refusal. The alleged written contract executed by Peters & Co. expressly recited that it was made subject to approval and ratification by the owner of the property. The undisputed evidence shows that it was never submitted to her for approval, and that she had no knowledge of its existence at any time prior to the commencement of this action. The intervener contends that the court erred in excluding certain letters which he offered in evidence for the purpose of showing certain authority in Peters & Co. as subagents appointed by Ostrander. Without discussing these offers in detail, we hold the letters were immaterial, and that no prejudicial error was committed in this regard. Ostrander had no power to appoint subagents and delegate to them authority to execute a written contract of sale which would be binding upon the defendant.

The intervener further contends that Mrs. Ater executed the blank deed as a conveyance to any purchaser who might be secured by Ostrander, and not as a conveyance to

Ostrander himself; that by such deed she ratified the contract of sale made by Peters & Co., as agents, and that, even though Peters & Co. were not her subagents, she thereby accepted their offer made to Ostrander. These contentions cannot be sustained. The deed was never sent to Peters & Co. Mrs. Ater never knew of the offer made by them. They were attempting to make the sale to Darling for $800. This fact was never communicated to her by them or by any other person. She did. not ratify a contract the terms of which were unknown to her. We approve the findings made by the trial court, and hold that they sustain the final judgment.

The judgments entered against the plaintiff and the intervener are, in all respects, affirmed.

HADLEY, C. J., MOUNT, FULLERTON, RUDKIN, and DUNBAR, JJ., concur.